Good morning. May it please the Court, my name is Elizabeth Fagan and I represent the Appalachian in this matter. I would like to reserve two minutes for rebuttal. This case is about a national youth sports organization's duty to implement generally accepted standards to protect young athletes from exacerbating injuries once an injury has occurred. This Court should reverse the District Court's decision to grant defendants 12b6 motion for two main reasons. First, a duty of care exists to remove a young injured player from play because exacerbating an injury is not an inherent risk of any sport, much less water polo, and thus primary assumption of the risk does not apply to bar a negligence claim. Second, all youth sports organizations owe a duty of care not to increase the risks inherent in a sport, and removing an injured player from the game would not fundamentally alter the nature of any sport, again, much less water polo. So why is that so? The District Court disagreed. The District Court strayed, in my belief, from the question of duty of care, which is a legal question, to the question of breach, which is a question of law. And we can see that. We discussed, to some extent, the case of Wattenberger, which involved the baseball player who popped his shoulder. That was decided on summary judgment. And if we look at the first instance said, that as a matter of law, the organization had a duty not to put an injured player back in the game. But it was a question of fact, whether the coach heard the player say that he popped his shoulder, whether the coach could have known that he had popped his shoulder, and what should have happened at that point in time. And I believe that the District Court here strayed into the question of, what did the coach know when she swam to the side? No, I'm asking a different question, actually. Okay, I apologize. It's this question of changing the nature of the game. There's something in California law that says, well, there's some risks that are inherent in particular games or particular sports. And we're not going to say that it is unlawful to allow this to go forward when that particular hazard is inherent in the nature of the game. And we're not going to change the essential nature of the game by some liability rules. And the district judge seemed to agree that some sort of concussion protocol that would remove a player who'd suffered a hard hit to the head would change the nature of the game, perhaps even making it impossible to play because hits are so frequent. How do you respond to that? Sure, Your Honor, in a couple different ways. First, USA Water Polo had the very concussion management and return to play protocols that we were advocating for already implemented for its national and Olympic teams. It would hardly alter the nature of the sport to have those in place. Now, is that in the complaint? It is in the complaint, Your Honor, and I can find the citation. No, I read the complaint, but I missed that piece. Okay. So those standards are already in place. And were it, in fact, to alter the nature of the game, those would not be in place at the Olympic and the national level. But the failure to implement them at the youth level cannot then be based on the idea that it would alter the nature of the game. I get that. Okay. Second, as a matter of public policy, I would like to focus on two things. First, the exceptions to the duty of care should only be applied if it's a matter of public policy. But public policy here is reflected in two ways. First, the recent codification by the California State Legislature of the very concussion management protocols that we advocated for. But even prior to that, at the time of the complaint, about 21 states had safe harbor laws in place for youth sports organizations. And those safe harbor laws said, if you follow the standard of care, we will bar negligence claims. So this idea that we're trying to create something new rather is untenable. In fact, what we were advocating for was actually what's consistent with public policy, not an exception to the duty of care. Counsel, I understand that for high schools and public, private, and charter schools, that California has had a law in the books very similar to what you're advocating for, I think, since 2012, before the injury here occurred. That's correct. Now, on the one hand, you're not arguing in this case that law applies to this conduct here. But am I correct that the California law that was in place for schools before this occurred did require coaches to have some awareness of concussions? And if someone does have the symptoms to pull them, basically what you're advocating here, that law was already requiring high schools to do that. That's right. The international consensus standards, which were agreed upon in 2001 and later incorporated into many states' laws, require education of coaches, require education of referees, for example, to identify particular sets of symptoms. And as the medical and scientific consensus has evolved, those symptoms have evolved. But so that when these things occur, it's not a matter of guessing. It's not a matter of, you know, some coach who isn't a physician, and we understand that. But that the education has already occurred. Baseline testing has occurred. So if someone's acting different than the way that they acted in the preseason baseline testing, for example, that there'd be some, at least, lay awareness of that. And then that is why the player is then removed, so that they can then get the proper medical attention and medical assessment. Then once they're cleared to play by the medical physicians, the coaches aren't making that judgment. The player can come back. And the reason for that, and the reason why it's so important, particularly for minors whose brains have not yet fully evolved, is because there's significant cognitive effects on putting a player back into play who's not fully recovered. And it's not just a matter of an additional concussion. Exertion alone can prolong the impact on a young player's brain. And for us, that's the importance of having these in place, not just at the highest levels of the game, but at all levels of the game. And public policy is now reflected by that, both taking those laws that did apply to the high school sports, and now also applying them to the youth organizations like USA Water Polo. Excepting for the moment the argument that a person or entity responsible for the safety of the players should have had some sort of concussion protocol in place, and that the injury to your client was proximately caused by not having it in place, why is U.S. Water Polo in a position to have that duty under California law? Because, Your Honor, one of the things that the courts look at, and Kessner and Kahn, the cases speak to this, is it's important to look at the role of the participant, and by participant I mean the defendant, the role of the defendant as it relates to the sport. Is it a co-participant? Is it a coach? Is it, for example, the pool, the owner of the pool? And so here, USA Water Polo is the organization that all teams, or whose rules all teams must follow. It sets rules on how the game is played. It sets rules on health and safety. It sets rules on types of injuries that should be looked out for. And in that circumstance, where it's the rule-making body for the sport, the only rule-making body, in fact, that can set these standards and require all of the referees and the coaches to follow them, is USA Water Polo. So USA Water Polo, whether we're talking in the first instance about count one... Well, let me ask you this and push back a little bit. If a particular water polo team playing under the auspices of U.S. Water Polo had an internal protocol that required close attention after a hard head hit and took players out of the game in a way that you're recommending should have been done, would that have been inconsistent with U.S. Water Polo's policies? I don't think they were required to leave that girl in under U.S. Water Polo's policies, were they? I agree, Your Honor. And if that were the instance where a team did the correct things and followed the correct protocols, I don't believe that we would have a claim against USA Water Polo. But it's not a claim against water polo. No, if they did the correct things, are they somehow in violation of what U.S. Water Polo would want them to do? I don't believe so. I don't believe so. But I take it that the Lazers Water Polo Club, I'm familiar with AAU basketball for girls, and I assume it's the same thing where the Lazers Water Polo Club would pay some fee to belong to USA Water Polo? I believe so, Your Honor, and certainly we've alleged that the players have to belong to USA Water Polo, so the players do pay a fee, yes. And they have to, in order to play on the Lazers, they have to pay the fee to USA Water Polo and be a member of the organization. Are we to infer anything at all under California law from the fact that California has now by statute required certain protocols for public entities and private schools and so on, but has not done so for private clubs such as this, to say, well, you know, in order to address the problem, they passed a statute suggesting that prior to the passage of the statute, existing law didn't cover it. So we now have existing law or the preexisting law that remains governing our case, that law that they thought to improve by passing the statute. Is there something that we need to infer from that that will hurt your client? I don't believe so, Your Honor. So the current law does also govern youth sports organizations like USA Water Polo, so the law has caught up. But I think sometimes the codification of laws or statutory laws do take time to catch up, but the duty of care generally is not always codified. Is there a new statute now that covers this? California Health and Safety Code Section 124235, which does govern USA Water Polo, and USA Water Polo has now implemented these protocols, has now implemented them, and the game has not changed. Obviously, that's outside the complaint. Well, I guess if they've implemented it, that tells us about the nature of the game question. That's right, Your Honor. And I think that that's our fundamental point, is that removing an injured player from a game, whether it's baseball, whether it's water polo, whether it's swimming and diving, does not change the fundamental nature of the sport. Initial concussions occur... Does that eliminate the need for injunctive relief? I'm not sure you could have got it anyway, given this particular plaintiff. It doesn't look like she's about to go play water polo again. That's right. And we did drop that prior to the current ruling on the motion to dismiss, because since she was no longer currently playing, she did not have standing for that claim anymore. If this is just an action for compensatory damages, then how are you pursuing it as a class action? So it's twofold. We have a claim for medical monitoring relief. And we do believe that medical monitoring relief is subject to class-wide attention. And in fact... But liability, it seems like, is going to be an individualized inquiry for every single one of these players, isn't it? There will be certainly issues of causation, at the very least. So with respect to the medical monitoring relief that we're seeking, what we typically have done, and we've done with respect to the NCAA, is seek Rule 23C4 certification with respect to the question of duty in the first instance. Did the organization have a duty to implement these standards? And were the standards then sufficient? Did they breach that duty by not implementing them in some way? Ultimately, with respect to the NCAA, we were able to obtain a settlement for medical monitoring relief for the four million existing current and former student-athletes, which consists of certain online testing and then neurological and neuropsychological diagnoses. It doesn't involve treatment. So unlike some medical monitoring cases involving cancer, that type of thing, where there's some type of ongoing treatment, this is just in the first instance to determine if you were hit in the head, if... Unlike the most water polo players, in some way have been, are you continuing to suffer from any type of neuropsychological defect? That person may have a separate personal injury claim that would have questions of causation and breach or causation and damages that would not be dealt with as part of the class action. And then our individual client here also has her individual claim for damages. And of course, at this point, we're not to the class certification issues. That's down the road if you prevail here. That's exactly right. Here, we're solely focused on this particular minor's claim under California law and what happened to her. And so for purposes of standing, we've certainly alleged that she's a member of a club that was subject to USA Water Polo's standards and that it's plausible had the proper concussion management and return to play protocols been in place that the coach would have been able to properly assess her being dazed and it's plausible she would have been removed. Whether or not she would have, in fact, had been removed is the question of, I'm sorry, a question of breach and a question of fact. And so we're solely focused on here, on the question of duty. Okay. We're almost out of time. Why don't we hear from the other side? Thank you, Your Honor. Good morning, Your Honor. Hang on just a sec, Ron. Okay. Steven Rennick of Manning & Cassel, Rod Ramirez-Trester for Appalooie United States Water Polo, Inc. I'd like to respond to something that you, Judge Fletcher, just commented and I'm sorry that the fact that USA Water Polo has adopted rules relating, you know, based on the new California statute, that that apparently solves the fundamental nature of the game issue. And that's not accurate. And part of that is because the way certainly counsels just presented their, what they construed as their claim, is not the way it was presented throughout this litigation in the district court. This case was never about whether or not an injured player or a player who was suspected of having an injury should be removed. Because that's what USA Water Polo's rules were before any of this. The fundamental problem here is that their argument was that any player who suffers a blow to the head needed to be removed and medically assessed. But I thought that they limited it to someone who suffered a blow to the head and then exhibited at least one of the signs of potential concussion. That's not the way they pled it. And that would, if that was the case, we wouldn't have a problem here because there would... Well, I'm not sure that's right. I mean, I did read the complaint. I missed the part about what the Olympic team does. But as I read it, they said, we need a protocol that will protect against this sort of injury. And they didn't spell out in precise detail the protocol that they thought was necessary. Well, but what their protocol included removing any player who had a head blow, not merely that there needed to be a quick assessment. It wasn't that there had to be a suspicion. I don't read the complaint as setting out a precise protocol. I read the complaint as saying that there should be a protocol and they're sort of roughly sketched out having to do with we're going to protect kids who've been hit in the head. Well, if that is in fact the way that the complaint is interpreted, then it fails under primary assumption of risk. Because what we're talking about then is minimizing the risk that's inherent in the sport. Judge Guilford was very clear when he was talking about the distinction that the plaintiffs have tried to talk about in terms of primary and secondary injuries, that they still come from the same risks that are inherent in the sport. And the plaintiffs, and as well as I believe us, cited a California case called Strapper that talks about the issue isn't the type of injury, the issue isn't the manner in which it occurs, it's the reason for the injury. And the plaintiffs themselves have talked about the reason why these secondary injuries, the reason why they say the potentially injured player should be removed, are the exact same ones that are the inherent risk, getting hit in the head by the ball, exerting oneself. These are the same things. The only issue is that given the alleged state of the person, they may suffer more severe injury. But California law courts have addressed that. They have been very specific that the fact that there are ways to lessen the severity of an injury does not take you outside of primary assumption. What about the case involving the injured baseball player? That seems somewhat analogous, doesn't it? No, because the core in what the California Court of Appeal decided was that the player informed the coaches that he felt his shoulder pop. And as they interpreted the facts, they said the player was seeking guidance from the coaches as to whether or not he should continue pitching, and they indicated he should. That was what the Court of Appeal found increased the risk. Advising an athlete to continue the activity when there was an increased risk of injury, there is no allegation to that effect here. Excuse me, go ahead. I was just going to say, yes, you're right, there's maybe not an affirmative advising, but there's certainly a failure to prevent the person from exposing themselves to even more severe injury. And that is the essence of primary assumption. There is no duty to minimize the risk. The risk is there. You know, these are kids. I mean, I cannot imagine saying that, you know, it is inherent in the game of water polo for children, kids, maybe teenagers, that they're supposed to stay in and get hit in the head repeatedly. That is not inherently in the game itself. I just don't get that. The California courts have applied primary assumption to minors, minors in youth sports organizations. For the first shot to the head, but why the second? I'm not sure I understand. Well, I mean, the primary, I'll give it, this is a gross analogy, but if I'm coaching a basketball game, kids fall down sometimes, and we can't take them out every time they fall down in a basketball game. But if they fall down and a bone's sticking out of their leg, that's not in the game. So when, in the concussion standpoint, when is someone getting a head shot, when does a coach have a duty to understand this is the equivalent of a bone sticking out of the leg? Well, I think now we're getting into, and plaintiff's counsel use this term a lot, public policy. There's a difference between what is good, arguably good public policy, and the states have chimed in on this, versus what is the legally imposed duty, and perhaps it seems harsh to say that there is no duty under primary assumption to remove a minor from activity if there's a suspicion that they're injured. But, you know, from the perspective of USA Water Polo, they did have a policy in place to address that, that if there was a suspicion of injury, they were not supposed to be returned to play until the injury was removed. Well, it sounds like the dispute here is really a factual one. No, because then we go back to, did the coach have a suspicion? Because... Why isn't that a factual question? Well, it's not a factual question against USA Water Polo. You know, then it's a question of what did the coach fail to comply with USA Water Polo's existing rules? Did he fail to, excuse me, she failed to accurately evaluate this individual as having the potential for an injury that required her to be removed under USA Water Polo's standards? They haven't sued the coach, they haven't sued the lasers team, and the argument before Judge Guilford, Ms. Fagan herself said that if this was an issue of a failure to comply with the rules, then that would not be a claim against USA Water Polo. I think they're alleging that whatever rules you keep alluding to were totally inadequate to protect the kids from this kind of injury. Well, but then, you know, I understand the feeling that there should be a higher duty to protect kids, but the bottom line is California law doesn't respect that distinction when it comes to primary assumption. Well, it might or might not. It depends on the vulnerability. Children or kids are more vulnerable to this sort of thing, and you have protection that's appropriate to who you have in front of you. Again, that's not the way primary assumption has been analyzed by the California courts, and the California courts... But you know, you keep saying to California courts, it occurs to me that this, of course, is a question of California law. Should we certify this question to the court? I think, you know, I think... I'll leave it at tender mercies to the California Supreme Court. I don't have, theoretically, a problem with that. I think if the court is convinced that this is a fundamental question of California law, then it should be addressed to the California Supreme Court. I don't think there is really that uncertainty in the California law, but I'm obviously going to defer to this panel and would suggest that if there's an issue of California law, that it should go to the California Supreme Court. I just don't think there is one. This is not a theory that has been adopted by any California court. So we're talking about recognizing a duty that has never been recognized by a California court and, in fact, has been rejected. The theory in our supplemental citation of authorities, I cited to... It was an unpublished case that said California courts have recognized primary assumption as applying to minors, and then they talked about three published California cases, and one of those published cases involved a 14-year-old wrestler who was injured in an after-school wrestling program, and they made the explicit argument that primary assumption shouldn't apply, and the California Court of Appeals said, yes, it does. I guess where I'm still having the problem, though, is that I appreciate the primary assumption of risk. Kids play sports. Kids are going to get hurt. I think everyone concedes that. I think the question is that if a child is showing signs of injury, then what duties does the coach have to remove them or put them back in the game? And that's not primary assumption. I'm not sure I agree with that, but I think your Honor's focus on the coach is the key here. USA Water Polo is not responsible, can't control how a coach, or in this case also the referee, observes what they see. Nobody thought... But wait, if that's true, why did you all bother to put in place the same protocol they're advocating for at the National and Olympic Court? Well, first of all, it's not the same protocol. Both the USA Water Polo rules and the new California statute is very specific that when there is a suspicion that an athlete has suffered a concussion, and so there's that initial issue that there has to be something that puts the coach, the referees, anybody else who's been... But they've alleged that here with respect to this particular child. No, they haven't. I seem to recall it says that she got hit, it was a hard hit to the head, and then she was dazed. Right. She swims over to the side, talks with the coach. I mean, if you don't have a suspicion of a concussion based on that, your suspicion antenna aren't working very well. Well, no, because if you look in the USA Water Polo rules, and I think, I'm not sure it's in the California statute, when they talk about dazed, it appears to be dazed. There has to be some outward manifestation, and part of the problem here... What do you mean, some outward manifestation? It has to be observable to an outside person, and in the... She appeared to be dazed is not enough? No, but there is no allegation that she appeared to be dazed. On paragraph 16 of the complaint, I just was hit hard in the face by a shot. HC swam to the side of the goal and spoke to her coach while her team was on offense, asked some questions, dazed. HC was returned to play. The word dazed is in the complaint. Right. Dazed is, but not appears to be dazed. Well, no, no, because... No, there is... I'm not... Is it unconscious as to say appeared to be unconscious? I mean, that can't be how this  Well, I would refer the court to ER 14, which is the first amended complaint, and there is a lengthy quote in there that the plaintiffs put in by... From Larry Drum, medical director and team physician for USA Water Polo, and one of the comments that he makes is, identifying and treating a concussion can be difficult since symptoms tend to be subjective and hard to objectively measure, and so it isn't simply a matter of she felt dazed. If she doesn't appear to be dazed, how is the coach supposed to know that she's dazed? I mean, this is not flippant. But that's part of the concussion protocol, where you ask questions. You ask what day it is, what's the score, what team are you playing, what was your last homework assignment. There are a whole series of questions that coaches are trained to ask in these situations, so it can't just be an eyeball test. There's more to it than that, isn't there? Potentially, but did California law on February 15, 2014 require that? There is nothing to that effect, and in fact, primary assumption says you don't have to ask them any questions at all. That may seem harsh, that may not seem to be good policy, and the California State Legislature in 2016 decided we want to make sure that that is done because it isn't required now. And we have to judge this case by the law, not by what we think is good policy. Can you explain again why Wattenberger doesn't control this case? Because in Wattenberger, the allegation was that the plaintiff explicitly told the coaches that he felt his shoulder pop, which is an observable sign that there's at least a potential injury there. He looked to them to tell him whether or not he should continue pitching, and they encouraged him to continue pitching. Again, none of those allegations are here. They had, of course, none here in the absolute sense, this girl's not a pitcher, she doesn't feel her shoulder pop, but what's appropriate to this sport happens, she gets hit in the head, she comes over to the coach, and essentially she's asking the coach, hey, what am I supposed to do? And she's dazed. Now, maybe the coach doesn't see that she's dazed, but it says she is dazed, and had the coach asked the question, the coach would have figured that out. I mean, why is the girl coming over to the side? Just to say hi? Well, actually, this is not in the complaint one way or another, but I believe it's the other. And I think we're now punishing, potentially, a concerned coach who, having observed... You know, I'm just reading the complaint. HC swam to the side of the goal and spoke with her coach. So she, HC, did something. Right, but we have to ask the basic question. Where was the coach? Would the coach normally be at the side of the goal? I suspect not. I can't tell you, but every sport I've ever... All I have and all you have is the complaint. Right. Well, but now the court itself is making assumptions here that... I am making no assumption. I read the complaint. You should read the complaint. Well, okay, but again, whether or not she went over there, there is no allegation that she asked anything that... Or, more importantly, the key factor in Wattenberger is not merely the report of the injury, which was obvious to everybody. You know, she got hit. There's no allegation that she told the coach anything. We're talking about subjective symptoms. She has to report them. Well, can I ask you this, just to test your... You keep relying on this primary assumption of risk theory, which seems to be completely inapplicable to the kinds of allegations they're making. So let's just change the facts to make them a little bit more egregious. Let's say that she got hit in the head, lost consciousness for a few seconds, actually went underwater, came up, was clear, plain as day, had no clue where she was, was just totally out of it. Isn't even in a position to go and ask for advice. Hey, should I remain in the game? Should I come out? At that point, isn't the failure of your organization to have in place rules to govern that situation a basis for liability? No, because under the USA Water Polo rules in existence at that time, the coach and the referee should have taken the player out. They didn't need to be under your scenario. You didn't need to ask any questions. You didn't need to do any investigation. It's quite obvious that there's the potential for serious injury there, and the child needed to be taken out. Let's say that she wasn't, and they say the reason for that is because whatever weak protocols you had in place were not adequate, were not stringent enough to ensure that a person in that condition would not be allowed to continue playing. I'm just testing the primary assumption of risk. You wouldn't say that, well, being left in the game and being subjected to another hit in the head because you're so out of it, you can't even protect yourself. You wouldn't say that that's an inherent part of the game, right? Yes, but I would say the situation is any further injury is part of the inherent risk. We're talking about different things. Again, I point to strapper. Okay, well, you're about two and a half minutes over time, so if you'd like to sum up. The bottom line here, harsh as it may be, is the governing law is primary assumption, and we cannot evaluate the liability of USA Water Polo on public policy. The question simply is, was there a violation of a duty owed under the very limited obligations imposed under primary assumption? And Judge Guilford and the facts and the allegations, I believe, make it clear that there was no such violation. Okay, thank you. Thank you. And you've saved some time. I just have three points that I'd like to make in rebuttal. First, in paragraph one of our complaint, which is at ER 86, we say that all youth athletes diagnosed with a concussion or exhibiting concussion-like symptoms during a contest should be removed from play. We haven't taken it so far to say that every time somebody's hit, play has to stop. So we very clearly limited this to either diagnosis or exhibiting concussion-like symptoms. The question then becomes one of foreseeability. And foreseeability, when analyzing that with respect to the duty of care, which is a question of law, is not about USA Water Polo or H.C. herself. It's about youth sports organizations like USA Water Polo and players, whether they're unconscious under the water, whether they're acting dazed. Is it foreseeable that someone who is injured or suffered a concussion or been hit in the head and is dazed, is it foreseeable that further hits to the head or exertion would prolong the cognitive deficits that come along with that concussion? And the answer to that, as we've alleged, is that since 2001, the scientific and medical experts would agree that, yes, it's very foreseeable that what we've alleged would happen. And finally, with respect to Wattenberger, and I briefly made this point on the front end, but there the court held that the duty of care exists to protect participants from aggravating injuries. And that's what we're talking about here, the duty of care. The court left the question. Issue of fact exists as to whether defendants were aware of plaintiff's injury. Whether this coach was aware of it, whether he would have been aware of it had he had the proper training under the protocols that we've alleged exist is the question of fact that we believe will be addressed later in the litigation. But we do ask that the court reverse the district court's decision to grant the motion to dismiss. Okay, thank you very much. Thank you both sides for their arguments. May all versus us part of water polo submitted for decision
judges: W. Fletcher, Watford, Owens